PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIEL TASCARELLA, | ) |
| | ) CASE NO. 4:26-CV-0024 |
| Plaintiff, | ) |
| | ) |
| v. | ) JUDGE BENITA Y. PEARSON |
| | ) |
| APTIV US GENERAL SERVICES | ) **MEMORANDUM OF** |
| PARTNERSHIP *et al.*, | ) **OPINION AND ORDER** |
| | ) [Resolving ECF No. 1–1) |
| Defendants. | ) |

The Court considers Plaintiff's Motion for a Preliminary Injunction, ECF No. 1–1, by which he seeks continued employment and healthcare benefits while this litigation proceeds against his former employer and healthcare benefits providers.[1]  At a hearing on January 28, 2026, the Court heard the Parties on the matter and issued the instant ruling.  *See* Minutes of Proceedings [Non-Document] 01/28/2026.  For the reasons herein and those stated on the record, a preliminary injunction is inappropriate.  The Motion is denied.

### I.  Introduction

**A.  History** [2]

On September 12, 2025, Defendant Aptiv US General Services Partnership—the American subdivision of a Swiss automotive technology supplier—offered Plaintiff Daniel Tascarella a job as the plant manager of its manufacturing facility in Vienna, Ohio ("Ohio Plant

---

[1] Plaintiff and the long-term disability healthcare insurer (Metropolitan Life Insurance Company, "Metlife") and the short-term disability claims management administrator (Sedgwick Claims Management Services. "Sedgwick") have agreed to their dismissal from this lawsuit.  The Court concurs.  *See* ECF No. 38.

[2] Derived, in part, from the Parties' proposed stipulations.  *See* ECF No. 28.

(4:26-CV-0024)

47.")  ECF No. 28–1.³  As one of the highest-ranking manufacturing employees at each site, the plant manager is responsible for the supervision and performance of Aptiv's Connected Systems Business unit.  See ECF No. 24–2 at PageID #: 292, ¶ 3.  Together with the offer letter, Aptiv sent Plaintiff a summary of employment benefits.  See ECF Nos. 28–2,⁴ 28–3,⁵ 28–4.⁶  That summary included coordinating instructions from Defendant Sedgwick (Aptiv's short-term disability benefits claims administrator), Defendant MetLife (Aptiv's long-term disability benefits funding insurer), and Blue Cross Blue Shield of Michigan⁷ (Aptiv's salaried employee health insurance provider).  See ECF Nos. 28–3,⁸ 28–4,⁹ 28–5,¹⁰ 28–6, 28–7, 28–8.  Section 5.05 of Aptiv's "Life and Disability Benefits Program for Salaried Employees, as Amended, Effective January 1, 2018" provides that "[i]f an Employee quits or is discharged, all coverages will cease as of the day the Employee quits or is discharged or on the date Length of Service is broken, if later. . ."  ECF No. 28–4 at PageID #: 461.

Plaintiff accepted the position of plant manager under the offered terms and started working at Ohio Plant 47 on September 29, 2025.  He worked two days before he stopped

---

³ A true and correct copy of the offer letter.

⁴ A true and correct copy of "A Brief Look at Aptiv U.S. Salaried Benefits, Benefits Effective – January 2025."

⁵ A true and correct copy of "APTIV, Your Aptiv Benefits Summary Plan Description, Aptiv Corporation, Welfare Benefit Plan Document and Summary Plan Description, For U.S. Salaried Employees, Effective January 1, 2019."

⁶ A true and correct copy of "Aptiv Life and Disability Benefits Program for Salaried Employees, as Amended, Effective January 1, 2018."

⁷ Plaintiff did not sue Blue Cross.

⁸ *Supra* n.4.

⁹ *Supra* n.5.

¹⁰ A true and correct copy of MetLife policy that funds Aptiv's long-term disability benefit plan, a welfare benefit plan that provides coverage to eligible salaried employees.

2

(4:26-CV-0024)

working due to health issues and began a medical leave of absence.  See ECF No. 31–1 at PageID #: 759, ¶¶ 7–8 (Declaration of Daniel Tascarella).[11]  On December 12, 2025, Plaintiff called Deroen Pruitt, Aptiv's vice president of human resources, and told Pruitt that his physician had placed him on a liver transplant recipient list.[12]  Consequently, Plaintiff said was unable to timely return to work and needed to extend his medical leave.  See ECF No. 31–1 at PageID ##: 761, 769, ¶ 17,[13]  While Plaintiff declares he told Pruitt that he intended to return to work at Ohio Plant 47 when able, he also acknowledges that he is "currently disabled from working."  See ECF No. 31–1 at PageID ##: 760–61, 769, ¶¶ 14,17.[14]

Based on the December 12, 2025 phone call, Aptiv believed Plaintiff's absence would be indefinite.  See ECF No. 24–2 at PageID #: 292, ¶ 4.  Given the "critical role" of the plant manager's responsibilities and the consequences of leaving the position vacant, Aptiv decided to end Plaintiff's employment and hire someone else to take his place.  See ECF No. 24–2 at PageID #: 292, ¶¶ 4–5.  That same day, Aptiv sent Plaintiff a notice of termination—effective December 31, 2025—and a proposed severance agreement.  See ECF Nos. 28–9, 28–10.

---

[11] *Cf.* ECF No. 24–2 at PageID #: 292 (Affidavit of Deroen Pruitt) (indicating Plaintiff worked "approximately one day").

[12] The record is unclear as to whether Plaintiff was *actually placed* on or merely *recommended to be placed* on a liver transplant list.  See ECF No. 31–1 at PageID #: 760, ¶ 13 ("[My doctor recommended that I be placed on a list for a potential liver transplant, due to having stage 4 liver failure.").  When questioned during the hearing, Plaintiff's counsel was unsure.  Nevertheless, the parties and Court accept that Plaintiff's health issues are serious and require medical treatment.

[13] Plaintiff's Phone Log.

[14] *Supra* n.11.

3

(4:26-CV-0024)

B.  Proceedings

On the day his termination took effect, Plaintiff sued Aptiv, Sedgewick, and MetLife in the Trumbull County Court of Common Pleas asserting six claims: Employee Retirement Income Security Act ("ERISA") interference, promissory estoppel, fraud in the inducement, unilateral contract, disability discrimination, and unlawful retaliation.  *See* Case No. 2025-CV-03285; 29 U.S.C. § 1140; Ohio Rev. Code § 4112.  At the same time, he moved for a temporary restraining order ("TRO") and preliminary injunction.  *See* ECF No. 1–1 at PageID ##: 122–25.  On that same day, the state court entered an *ex parte* TRO under Ohio R. Civ. P. 65(A).

On January 6, 2026, Aptiv removed the case under 28 U.S.C. §§ 1331, 1332, 1441, and 1446.  *See* ECF No. 1.[15]  At the time, Aptiv was the only Defendant served with the verified complaint and summons.[16]  Three days later, the Court entered an Order to Show Cause that provided, in relevant part:

> The parties shall discuss the Court's decisions in *Izquierdo v. Wipro Ltd.*, No. 4:25CV2361, 2025 WL 3236519 (N.D. Ohio Nov. 19, 2025) (Pearson, J.) (denying plaintiff's emergency motion for a TRO), and *Izquierdo v. Wipro Ltd.*, No. 4:25CV2361, 2025 WL 3257089 (N.D. Ohio Nov. 21, 2025) (Pearson, J.) (denying plaintiff's renewed motion for a TRO), as well as the decision of the Court of Appeals in *Izquierdo v. Wipro Ltd.*, No. 25-3931 (6th Cir. Dec. 17, 2025) (order) (denying motion for injunction pending appeal), in their briefs.

---

[15] Notice of Removal.

[16] "When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A); *see also Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 201 (6th Cir. 2004). According to the state court docket, MetLife was served on January 7, 2026 and Sedgwick on January 8, 2026.

4

(4:26-CV-0024)

ECF No. 5 at PageID #: 140. With the consent of the Parties, the Court extended the *ex parte* TRO to January 28, 2026 to provide time for the Parties to prepare and comply. See ECF Nos. 4, 5, 11; Fed. R. Civ. P. 65(b)(2). The Parties timely filed their briefings, and the Court held a hearing on the Motion for Preliminary Injunction on January 28, 2026. See ECF Nos. 24, 25, 31; Minutes of Proceedings [non-document] 01/28/2026. The Court considered the pre-hearing briefings, exhibits submitted prior to and during the hearing, arguments of counsel, and the record to date.

## II. Law

A preliminary injunction under Fed. R. Civ. P. 65(a) is an exceptional form of relief and "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001). In weighing disposition, district courts consider whether:

> (1) the movant has a strong likelihood of success on the merits;
> (2) the movant would suffer irreparable injury without injunctive relief;
> (3) granting injunctive relief would cause substantial harm to others; and
> (4) the public interest would be served by granting injunctive relief.

See *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Movants "bears the burden of persuading the court that the factors weigh in favor of granting a preliminary injunction" and "must establish [their] case by clear and convincing evidence." *Williamson v. White*, No. 93-6017, 1994 WL 49594, at *1 (6th Cir. Feb. 17, 1994) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 441 (1974)); *Hartman v. Acton*, 613 F. Supp. 3d 1015, 1022 (S.D. Ohio 2020) (collecting cases) (cleaned up). Courts consider all four factors; but "whe[n] there is no likelihood of *either* success on the merits *or* irreparable harm, an

5

(4:26-CV-0024)

injunction is unwarranted—regardless of the showing on the other factors." *Schimmel*, 751 F.3d at 430 (collecting cases).

### III. Discussion

In *Izquierdo v. Wipro Ltd.*, No. 4:25CV2361, 2025 WL 3236519 (N.D. Ohio Nov. 19, 2025) (Pearson, J.), the Court denied plaintiff's emergency motion for injunctive relief to reinstate the plaintiff's employment and healthcare benefits. In its ruling, the Court reasoned that "[a]lthough the allegedly wrongful termination of employment and medical benefits always concerns the Court, the present circumstances warrant neither expeditious adjudication nor emergency injunctive relief." *Id.* at *1. On appeal, Sixth Circuit affirmed that denial.[17] *See Izquierdo v. Wipro Ltd.*, No. 25-3931, at *2–3 (6th Cir. Dec. 17, 2025). The analysis conducted and conclusions reached herein are similar.

A. Likelihood of Success

There is a likelihood of success on the merits when "the plaintiff has raised questions . . . so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). Based on the record, Plaintiff will likely not succeed in proving unlawful termination.

Section 510 of ERISA prohibits employers from terminating their employees to interfere with their benefits plans. *See* 29 U.S.C. § 1140. To establish a violation, an employee must show "the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering

---

[17] The Sixth Circuit agreed with the Court's overall conclusion, but indicated that the question of irreparable harm may have been decided differently. *See Izquierdo*, No. 25-3931, at *6 ("Still, even if the district court erred in its irreparable harm analysis…we review the district court's ultimate weighing of the injunction factors for an abuse of discretion.").

(4:26-CV-0024)

(3) with the attainment of any right to which the employee may become entitled." *Hrdlicka v. General Motors*, 63 F.4th 555, 574 (6th Cir. 2023) (citing *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). Importantly, the employer must have had the "specific intent to violate ERISA." *Hrdlicka*, 63 F.4th at 574 (citing *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)). To establish that intent, the employee must show that interfering with their rights was at least a "motivating factor" in the decision. *Id.* (citations omitted). Once the employee establishes a *prima facie* ERISA violation, the employer can rebut by offering a "legitimate, nondiscriminatory reason for its challenged action." *Id.* (citation omitted). If rebutted, the burden shifts back to the employee to prove that, legitimacy aside, interference was still a motivating factor in the termination or that the employer's justification was pretextual. *See Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991).

  At the threshold, there is a genuine question as to whether the medical benefits Aptiv provided Plaintiff were governed by ERISA. It follows, therefore, that whether Count 1 alleges retaliation or interference with an ERISA plan is uncertain. Aptiv argues that its short-term disability coverage is "payroll practice" exempted from ERISA requirements under 29 C.F.R. § 2510.3–1(b)(2). *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 481 (6th Cir. 2007) ("as the [Disability Absence Plan] plainly falls under the definition of a payroll practice, it was not covered by ERISA and the district court properly denied Langley's claim for disability-absence benefits). Still, if ERISA does not apply, other claims—Count 2 (promissory estoppel) and Count 6 (unlawful retaliation)—supplant Count 1's allegation that Aptiv is liable for interference or retaliation under state law.

  Plaintiff shows, at best, an inference of retaliation or improper termination. *See* ECF No. 31 at PageID ##: 753–54. While a medical leave of absence can be a reasonable accommodation, an accommodation request is not reasonable when an employee only

7

(4:26-CV-0024)

states they do not know when they will be able to return to work, as employers are not required to "wait indefinitely for [their] employee's medical condition[s] to be corrected." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citing *Myers v. Hose*, 50 F.3d 278, 283 (6th Cir. 1995)).  Aptiv's termination letter to Plaintiff stated:

> We received notification that your leave has been extended through at least March 23, 2026.  The role of Plant Manager at [Ohio Plant 47] is a critical position for Aptiv that must be filled, and it is not feasible to hold it open for four more months, indeed it would be an undue burden on the company to do so, particularly with no definitive return to work date.  As a result, we are left with no choice but to fill the position and terminate your employment.  Your employment will be terminated effective December 31, 2025.

ECF No. 28–9 at PageID #: 648.  According to Aptiv, its decision to terminate Plaintiff was based on its business needs and not motivated by or connected with any pending or prospective benefits claims.  *See* ECF No. 24–2 at PageID #: 293, ¶ 8.  As support, Aptiv's counsel argued at the hearing that Plaintiff is presently incapable of executing the duties and responsibilities of any one of the approximately 85 professional positions available at Ohio Plant 47.  *See* Minutes of Proceedings [Non-Document] 01/28/2026.  Plaintiff did not disagree.

The Court will not "sit as a 'super-personnel department,' second-guessing management decisions" made by Aptiv.  *Hardesty v. Kroger Co.*, 758 Fed.Appx. 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)); *see also Lee v. City of Columbus, Ohio*, 636 F.3d 245, 257–58 (6th Cir. 2011) ("It is not within the province of the courts to . . . 'act as super personnel departments to second guess an employer's facially legitimate business decisions.' ") (citation omitted).

There is no evidence that Plaintiff's termination was motivated by anything other than Aptiv's legitimate business need for the efficient operation of Ohio Plant 47.  As the Court noted at the hearing, it is not persuaded—based on the record to date—that Plaintiff can successfully

8

(4:26-CV-0024)

prove he was unlawfully terminated. See Minutes of Proceedings [Non-Document] 01/28/2026. Analysis of the first factor weighs against injunctive relief.

B.  **Irreparable Injury**

Generally, the loss of employment alone is not an irreparable injury because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Izquierdo, 2025 WL 3236519, at *3 (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)) (cleaned up). Yet harms to "health and well-being without access to healthcare are not compensable, and courts have found irreparable harm in similar situations where the plaintiff alleged a critical need for healthcare." Izquierdo, No. 25-3931, at *2–3 (citing Carabillo v. ULLICO Ind. Pension Plan & Tr., 355 F. Supp. 2d 49, 54 (D.D.C. 2004)). The loss of medical benefits may be *per se* irreparable harm "where the plaintiff alleges a critical need for healthcare." Farnham v. Campari America, LLC No. 25-CV-275, 2025 WL 2423328, at *2 (E.D. Ky. Aug. 21, 2025) (quoting Hayden v. Berryhill, No. 16-178, 2017 WL 743749, at *3 (E.D. Ky. Feb. 24, 2017)). As the Sixth Circuit noted, there are "a number of cases where the District Court for the District of Columbia found irreparable injury where the plaintiff additionally alleges a critical need for healthcare, as opposed to mere financial hardship." Izquierdo, No. 25-3931, at *5 (quoting Carabillo, 355 F. Supp. 2d at 54 (collecting cases)) (cleaned up).

While keeping the above in mind, Plaintiff has not, at this stage, proven *(1) a lack of access to healthcare* or *(2) harm to health and well-being without access to healthcare*. He remains insured and can obtain replacement coverage to follow its termination. At the hearing, the Court found that, on balance, it does not believe Plaintiff will suffer irreparable harm if his employment and its correspondent health benefits are not reinstated because the benefits Plaintiff

9

(4:26-CV-0024)

claims are at risk if he is terminated (short-term disability, long-term disability, and the cost of health care coverage) are monetary in nature.  Additionally, Plaintiff has access to COBRA continuation coverage, ensuring that he and his family can maintain their current health benefits or convert to another plan.  See ECF Nos. 24–2 at PageID #: 292, ¶ 7, 28–3 at PageID #: 371 ("If your disability leave is cancelled and you are separated, health care coverage will cease at the end of the month in which your approved disability leave ends.  You may continue your health care coverage under COBRA or conversion.").  Furthermore, Plaintiff can be awarded any costs accrued from COBRA or plan conversion, if successful at trial.  See *Farnham v. Campari Am., LLC*, No. 5:25-CV-275-CHB, 2025 WL 2423328, at *2 (E.D. Ky. Aug. 20, 2025) ("[R]egardless of whether Farnham could continue his previous insurance through COBRA, he has not demonstrated the existence of harm that 'money damages' cannot fix.") (citation omitted).  The disability benefits at issue here are similarly monetary.  Plaintiff is also eligible for Medicare and Social Security, cutting against irreparable harm.  In summary, Plaintiff is not in danger of losing healthcare coverage if injunctive relief is denied.

Courts also find that external factors that may prevent immediate re-employment will not establish the requisite showing of irreparable harm.  See *Sampson*, 415 U.S. 61, 92 n. 68 ("We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual"); *Anderson v. Kelley*, No. 92-6663, 1993 WL 524235, at *6 (6th Cir. Dec. 15, 1993) (reversing the district court's grant of a preliminary injunction requiring defendants to reinstate plaintiff to her former position and enjoining any retaliation against her for bringing the action).  Plaintiff has not pled a financial

10

(4:26-CV-0024)

barrier to obtaining coverage, but if he had his long history of employment and possible severance benefits would have weakened such a claim.

On balance, Plaintiff has not shown by clear and convincing evidence that he will suffer irreparable harm absent Court intervention. Analysis of this second factor weighs against injunctive relief.

**C. Substantial Harm to Others**

Injunctive relief is appropriate when it will not cause substantial harm to those beyond the parties in the dispute.[18] *See Coal. to Def. Affirmative Action v. Granholm,* 473 F.3d 237, 244 (6th Cir. 2006); *Brunner,* 543 F.3d at 361. Aptiv argues that "the effect of accepting Plaintiff's allegations on their face in such a way to force Aptiv to continue to employ him and provide him benefits on an ongoing and open-ended basis has broader implications for employers." ECF No. 24 at PageID #: 209. Granting injunctive relief under these circumstances—absent a showing of Aptiv's *specific intent* to avoid ERISA liability—would mean that "every employee discharged by a company with an ERISA plan would have a claim under § 510." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001).

Aptiv has convincingly demonstrated that employers outside those present in this litigation would be substantially harmed by a preliminary injunction. Analysis of the third factor weighs against injunctive relief.

---

[18] The Court recognizes that Plaintiff's wife may suffer some harm in the absence of reinstatement of his employment and health benefits. In any event, the third factor assesses the likelihood of substantial harm to others if injunctive relief were to be *granted*, not denied. Harm absent an injunction is assessed in the second factor and confined to the movant. *See Schimmel,* 751 F.3d at 430. Even so, Plaintiff and his wife may be employed or insured through other means (*e.g.*, COBRA, public marketplace, employer-provided insurance, Medicare) which, though unnecessary for the instant ruling, is sufficient to mitigate any substantial harm to his wife under the third factor.

(4:26-CV-0024)

### D. Public Interest

The public interest is served when a preliminary injunction implicates an interest in the enforcement of contractual obligations, including employment agreements. *See Tumblebus Inc. v. Cranmer,* 399 F.3d 754, 760 (6th Cir. 2005). The public is well served by having employers live up to the promises they make to those willing to be employed by them. But there are also reasons justifying employer decisions—however difficult or emotionally fraught they may be—to terminate an employee unable to perform the duties for which they were hired. Analysis of the fourth factor weighs against injunctive relief.

### V. Conclusion

Plaintiff has failed to establish by clear and convincing evidence a strong likelihood of success on the merits, irreparable injury, the absence of substantial harm to others, or a strong public interest in favor of judicial intervention at this early stage in litigation. Having weighed these factors, the Court denies his Motion for a Preliminary Injunction. *See* ECF No. 1–1. This litigation shall proceed as outlined in the Federal and Local Rules of Civil Procedure. A separate Case Management Conference Plan/Order will issue.

    IT IS SO ORDERED.

| | |
|---|---|
| February 4, 2026 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |